UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
LOREN D. LAMPROS,                      :
                    Plaintiff,         :        10 Civ. 9576 (DLC)
                                       :
        -v-                            :        OPINION AND ORDER
                                       :
BANCO DO BRASIL, S.A.,                 :
                    Defendant.         :
                                       :
-------------------------------------- X

Appearances:

For Plaintiff:
Maury B. Josephson
Disanto Bowles Bruno & Lutzer LLP
15 Maiden Lane
New York, New York 10038

For Defendant:
Barry Asen
Jennifer A. Goldman
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177

DENISE COTE, District Judge:

On December 23, 2010, Loren Lampros ("Lampros") filed this action alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as well as a claim for promissory estoppel. The defendant Banco do Brasil ("BdB") has moved for summary judgment on all three claims. For the reasons that follow, the defendant's motion for summary judgment is granted.

BACKGROUND

The following facts are undisputed or as shown by the
plaintiff unless otherwise noted.  Lampros describes his
national origin as American.[1]  In 1999, he joined the New York
branch of BdB as its Controller.  The New York branch employs
approximately 90 employees, the majority of whom are either
Brazilian or Portuguese.  In 2000, Lampros became a member of
the New York branch's Management Committee.  As of January 2008,
the Management Committee consisted of: General Manager Ivan de
Souza Monteiro ("Monteiro"); Deputy General Managers Maria
("Maria") and Daniel Faria Costa ("Costa"); Deputy General
Manager and Treasurer Alessandro Gajano ("Gajano"); and Head of
Operations Alvaro Baptista ("Baptista"), as well as the
plaintiff.  Monteiro, Maria and Costa are Brazilian.  Gajano is
Italian-American, and Baptista is Portuguese-American.

Lampros Offered Position as Risk Manager

In early 2007, a plan to relocate the branch's Operations
Department, including the Controller position, to the Orlando,
Florida Service Center was developed.  In December of 2007, BdB
asked Lampros to relocate to Orlando.  Lampros declined and
began interviewing for positions at other banks.  He accepted a

---

[1] Under Title VII, the term "national origin" refers to "the
country where a person was born, or, more broadly, the country
from which his or her ancestors came."  Espinoza v. Farah Mfg.
Co., Inc., 414 U.S. 86, 88 (1973).

position with Hanover Community Bank in Long Island and announced his intention to resign from his position at BdB.

In January 2008, Monteiro and Maria offered Lampros the position of Risk Manager in the New York branch to begin in 2009. Lampros accepted. Monteiro and Maria told Lampros that they would provide him with support and training to prepare him for his new role. In the meantime, Lampros continued as Controller with additional responsibilities in the areas of accounting, administration, investigations and human resources. During this interim period, Lampros prepared to take a certification exam given by the Global Association of Risk Managers ("GARP") and reviewed risk management reports that addressed value at risk ("VAR"). He also met scores of times with Bijil Paul ("Paul"), an Assistant Risk Manager, to discuss the functions of a Risk Manager. The plaintiff did not, however, enroll in a GARP certification course or take the GARP exam that was offered in November of 2008. In March and September of 2008, the plaintiff was asked to attend risk management training and seminars and he chose not to attend either. In late 2008, he traveled to BdB's Head Office in Brazil to meet with the risk management personnel there and to learn how to use Risk Watch software.

Lampros Declines to Hire LoPiccolo

In mid-2008, Gajano and his subordinate asked the plaintiff to interview Giuseppe LoPiccolo ("LoPiccolo"), an Italian-American, for an Assistant Risk Manager position.  Lampros declined to hire LoPiccolo.  BdB then hired LoPiccolo as the Controller of an affiliated bank in White Plains that BdB planned to open.

Lampros believes that his refusal to hire LoPiccolo strained his relationship with Gajano.  At a meeting in September 2008, Gajano yelled at Lampros and used profanity toward him for approximately 10 minutes.

2008 Complaints of Discrimination

In the last quarter of 2008, BdB's New York office underwent a reduction in force.  As part of this reduction in force, Avelino Pais ("Pais"), a Portuguese foreign exchange trader for Bdb, was laid off.  In September, Pais complained to Lampros that Gajano was discriminating against him because he was not Italian.  Lampros conveyed Pais' accusation to BdB's Human Resources Department and to Monteiro.  In December, while on a trip to the BdB Miami office, Lampros told Marivaldo Soares ("Soares"), the Controller and Compliance Officer in BdB's Miami Office, that Gajano was firing people, including Pais, for discriminatory reasons.  Lampros claims that after he complained

4

of Gajano's acts of discrimination, Gajano's treatment of him worsened.  For example, at a December meeting of the Asset Liability Committee ("ALCO"), Gajano mocked and yelled at Lampros.

Lampros Assumes Position as Risk Manager

In January 2009, the plaintiff assumed his position as Risk Manager.  Maria quickly became dissatisfied with Lampros' performance as Risk Manager and consulted with the bank's employment law counsel.  In a January 28, 2009 e-mail to Monteiro, Maria outlined a script for a conversation he would have with Lampros to explain why Maria was not satisfied with his performance.  The script described the Management Committee's expectations of Lampros in his new position as Risk Manager, and mentioned several problems that had arisen during the plaintiff's transition into this new role.  The script ended with a proposal that the plaintiff conduct a complete assessment of the risk management area and prepare an action plan to address the weaknesses uncovered by the assessment.  The e-mail stated that counsel had advised Maria that, in case the plaintiff sued the company down the line, it would be advisable for Monteiro to be included in the conversation.  The conversation with Lampros outlined in this January 28 e-mail never occurred.

On January 29, Lampros, Gajano, Monteiro, Costa and others attended the January ALCO meeting.  The meeting took place on the heels of the 2008 financial crisis.  March of 2008 had witnessed the collapse and sale of Bear Stearns, and in September of 2008 Lehman Brothers filed for Chapter 11 bankruptcy protection.

At the January ALCO meeting, Gajano recommended that the bank continue to invest its end-of-day liquidity balance with the Federal Reserve Bank.  Lampros recommended that the bank consider alternatives and that it remain "agile" in seeking better investment returns.  Monteiro and Costa recall that Lampros suggested placing the bank's end-of-day balances at banks, such as JP Morgan Chase.  The plaintiff disputes this characterization of his recommendation.  He claims that he did not recommend moving all, or even a substantial portion, of the overnight funds out of the Federal Reserve Bank, but merely recommended that the branch be "agile" in seeking better investment returns.  The minutes for the meeting state that "Loren Lampros suggested alternative investments should be considered as the December P&L was affected by fed rate cut from 1.00% to 0.25%."

The plaintiff claims that in response to his suggestion, Gajano became very belligerent and started to berate the

6

plaintiff in front of the entire group.  Monteiro and Costa were surprised by the plaintiff's suggestion because they did not expect the bank's Risk Manager to propose a riskier investment of the bank's funds.

Following the meeting, Gajano proposed edits to the meeting minutes that were not included in the final version.  The minutes reflect a discussion regarding how the bank should invest its excess liquidity.  Gajano's edits indicated that Gajano had "asked for ALCO's consensus to invest excess liquidity at the Fed."  Gajano also proposed adding the following comments to the minutes:

> In New York, the only objection came from Mr. Lampros. While objecting that the ALCO should not be making such decision, Mr. Lampros indicated that, given what happened in December,[2] we need to be "agile" and look for alternative investments, namely MMDA's or Interbank deposits.

Gajano's edits to the January minutes also reflected his disagreement with Lampros about the assistance Risk Management should be providing to the Treasury department.  For example, Gajano proposed the following edits:

> Mr. Gajano had asked for confirmation that Mr. Ehrbar [a member of the Risk Management team] would continue to help develop an in-house Treasury front-end system. . . .
> However Loren Lampros, Risk Manager disagreed with the

---

[2] In December 2008, the United States financial markets were in turmoil.  On December 1, 2008, the National Bureau of Economic Research announced that the United States had been in a recession since December 2007.

idea of Risk Management sharing Mr. Ehrbar's resources
to develop the front end system, as it could be
conflict of interest.

Monteiro concluded that the proposed edits would not be included
in the minutes.

On February 12, the plaintiff complained to Monteiro of
Gajano's "abusive, intimidating, un-businesslike and
unprofessional behavior." At this meeting, Lampros did not
accuse Gajano of discrimination or retaliation.

The plaintiff claims that on March 3, Gajano engaged in an
"email diatribe" with the plaintiff, on which he copied
Monteiro. The catalyst of this "email diatribe" was an email
sent by Paul to Lampros, Gajano, Monteiro and many others
regarding "Interest Rate Sensitivity Analysis." Gajano and Paul
exchanged e-mails on the subject, which prompted Lampros to send
the following e-mail to Gajano, on which all of the other
recipients were copied:

Alessandro:

Perhaps we should sit down and discuss this like
gentlemen so we're all on the same page. I find this
bantering unproductive. We have made in [sic] clear
more than once that our Reports at present do not
include future value transactions. We believe the way
forward is to capture these transactions via DB 2. As
soon as Robert has concluded the Mapa da Gapa, our
next step is to capture the data from DB2 rather than
StorQM reports or manual adjustments to the present
stream of reports.

8

(Emphasis supplied.)  Gajano's lengthy response to Lampros
copied Monteiro, but not the other e-mail-chain recipients.  It
concluded with the following:

> My proposal, until a permanent solution is found, is
> that Risk Management should consider, or at least
> mention, separately, deals not included in the Risk
> report, rather than for Treasury to alert Risk of such
> deals.  Your negative interpretation and description
> of my request as "bantering" indeed rendered
> unproductive by the inability or unwillingness to
> provide the needed information, and your suggestion to
> adopt a gentlemanly approach reveal that you have
> seriously misconstrued my intentions borne by my
> concerns and responsibility towards the Bank.
> Treasury needs and will continue to request from Risk
> the necessary tools in order to effectively perform
> their function in the best and safest interest of the
> Branch.  I would encourage you to continue supporting
> the cooperation between Treasury and Risk Management
> which has led, so far, to very productive results
> reflected into the completion of data and risk reports
> currently employed by the Branch.

(Emphasis supplied.)  The plaintiff contends that this e-mail
exchange and Gajano's proposed edits of the minutes of the
January ALCO meeting demonstrate the escalation of abusive
treatment the plaintiff suffered at the hands of Gajano.

Termination of Lampros' Employment

Sometime between February and March of 2009, Monteiro and
Maria met to discuss terminating the plaintiff's employment.
Monteiro and Maria consulted with Costa and Leandro Alves, who
agreed with their decision.  On April 22, 2009, Monteiro and
Maria informed the plaintiff that he was fired due to

unsatisfactory performance.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holocomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

In cases involving claims of employment discrimination "an extra measure of caution is merited in affirming summary judgment" because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006). Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holocomb, 521 F.3d at 137. Ultimately, the test for summary judgment "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149,

157 (2d Cir. 2000).

The plaintiff has brought three claims.  He asserts that
BdB fired him due to its discrimination against Americans and in
retaliation for his complaints that BdB had discriminated
against Pais, a Portuguese foreign exchange trader.  He also
asserts that BdB broke its promise to him to train him for his
new job as Risk Manager.  Each of these claims will be addressed
in turn.

1. Title VII National Origin Discrimination

Under Title VII, it is unlawful for an employer "to
discharge any individual . . . because of such individual's
race, color, religion, sex, or national origin."  42 U.S.C. §
20003-2(a)(1).  An individual's claim of intentional
discrimination is analyzed under the familiar McDonnell Douglas
burden-shifting framework.  See, e.g., Reynolds v. Barrett, 685
F.3d 193, 202 (2d Cir. 2012).  Under this framework, a plaintiff
establishes a prima facie case of intentional discrimination by
showing that "(1) he is a member of a protected class; (2) he
was qualified for the position he held; (3) he suffered an
adverse employment action; and (4) the adverse action took place
under circumstances giving rise to an inference of
discrimination."  Id. (citation omitted).

Title VII protects individuals from discrimination on the

basis of their national origin.  This term does not embrace
citizenship.  <u>Espinoza</u>, 414 U.S. at 95.

In order show that he is qualified for the position, the
plaintiff need only "establish basic eligibility for the
position at issue, and not the greater showing that he satisfies
the employer." <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248
F.3d 87, 92 (2d Cir. 2001).  In a case such as this, "where
discharge is at issue and the employer has already hired the
employee, the inference of minimal qualification is not
difficult to draw."  <u>Id.</u>  With respect to the third prong of the
<u>prima facie</u> case, in the context of an intentional
discrimination claim, "[a] plaintiff sustains an adverse
employment action if he or she endures a materially adverse
change in the terms and conditions of employment." <u>Brown v.
City of Syracuse</u>, 673 F.3d 141, 150 (2d Cir. 2012).  The final
prong of a <u>prima facie</u> intentional discrimination claim, the
requirement that the adverse employment action take place under
circumstances giving rise to an inference of discrimination, can
be established in a number of ways.  One method available to the
plaintiff is to show "that an employer treated plaintiff less
favorably than a similarly situated employee outside his
protected group." <u>Ruiz v. County of Rockland</u>, 609 F.3d 486, 493
(2d Cir. 2010).  Other circumstances raising an inference of

discrimination include "the employer's invidious comments about others in the employee's protected group; or the sequence of events leading to the plaintiff's discharge." <u>Sassaman v. Gamache</u>, 566 F.3d 307, 312 (2d Cir. 2009)(citation omitted).

If the plaintiff establishes a <u>prima</u> <u>facie</u> case of intentional discrimination, the burden shifts to the defendant to offer "a legitimate, nondiscriminatory reason for the adverse employment action." <u>Zimmerman v. Assoc. First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001).  If the defendant does so, the burden returns to the plaintiff to demonstrate that he "has been the victim of intentional discrimination," which he can do by showing that "the proffered reason was not the true reason for the employment decision." <u>Bucalo v. Shelter Island Union Free School Dist.</u>, 691 F.3d 119, 129 (2d Cir. 2012)(citation omitted).  While the "intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000) (citation omitted).  The plaintiff may make out a claim for intentional discrimination even if the ultimate decision-maker held no discriminatory animus, "so long as [an] individual shown to have impermissible bias played a

meaningful role in the process." <u>Holocomb</u>, 521 F.3d at 143
(citation omitted).

It is undisputed that the plaintiff suffered an adverse
employment action, the termination of his employment.  The
parties contest, however, whether the plaintiff has carried his
burden with respect to the other three prongs of the prima facie
case.

In his complaint and again in opposition to this motion,
the plaintiff identifies his national origin as American and
asserts that BdB discriminated against him because he was
American.  This satisfies his obligation to identify a protected
class based on national origin.

Because the plaintiff has previously described his claim as
arising from his status as "not Italian," the defendant has
argued that the plaintiff has failed to show his membership in a
protected class.  A plaintiff may be permitted to describe his
protected class through exclusion,[3] but that issue need not be

_____

[3] A viable claim for discrimination may arise when a plaintiff
claims he was discriminated against because he did <u>not</u> possess a
particular characteristic.  In <u>Shapolia v. Los Alamos Nat.</u>
<u>Laboratory</u>, 992 F.2d 1033 (10th Cir. 1993), the plaintiff
claimed that her supervisor gave her a negative job evaluation
because she was <u>not</u> <u>Mormon</u>.  The Court noted that "Title VII has
been interpreted to protect against requirements of religious
conformity and as such protects those who <u>refuse to hold</u>, as
well as those who hold, specific religious beliefs." <u>Id.</u> at
1036.  <u>See</u> <u>also</u> <u>Fortino v. Quasar Co.</u>, 950 F.2d 389, 392 (7th
Cir. 1991) ("We may assume that just as Title VII protects
whites from discrimination in favor of blacks as well as blacks

resolved because Lampros has emphatically argued that he is claiming discrimination on the basis of his American national origin.[4]

The plaintiff has also demonstrated that he possessed the "basic eligibility" requirements for the position of Risk Manager.  The qualifications requirement is already a "minimal" one, and it is met in this case by the fact that the defendant saw fit to hire the plaintiff for this position.  See Slattery, 248 F.3d at 92.

The plaintiff, however, has not presented evidence in support of the fourth prong of his prima facie case.  He has not demonstrated that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. The plaintiff has not attempted show that similarly situated individuals outside of the protected class were treated differently.  Nor has the plaintiff pointed to any invidious comments about Americans or even about non-Italians.  Instead, the plaintiff relies solely on the fact that he was replaced by

from discrimination in favor of whites, so it protects Americans of non-Japanese origin from discrimination in favor of persons of Japanese origin.").

[4] The true importance of this question relates not to the first prong, but the fourth prong of the McDonnell Douglass burden-shifting framework.  If the protected class is defined as "those who are not of Italian national origin," then the identity of Lampros' replacement as a person of "Italian" national origin becomes more relevant.

LoPiccolo, an Italian-American.  It is true that "the mere fact
that a plaintiff was replaced by someone outside the protected
class will suffice for the required inference of discrimination
at the prima facie stage of the Title VII analysis." Zimmerman,
251 F.3d at 381.  But, the plaintiff has not demonstrated that
he was replaced by someone who was outside the protected class,
which he has defined as "American."  The plaintiff has not
disagreed with the defendant's description of LoPiccolo as an
Italian-American.  Thus, both Lampros and LoPiccolo claim
America as a country from which they came.

     The absence of evidence suggesting discrimination is
underscored by the fact that Maria and Monteiro, the very
individuals who offered the plaintiff the position of Risk
Manager, were also the primary actors who made the decision to
fire the plaintiff.  "[W]hen the person who made the decision to
fire was the same person who made the decision to hire, it is
difficult to impute to [him] an invidious motivation that would
be inconsistent with his decision to hire." Grady v. Affiliated
Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997).

     Even if the plaintiff had presented prima facie evidence of
discrimination, however, the plaintiff's claim for
discrimination would still fail.  The defendant has offered a
legitimate non-discriminatory reason for the plaintiff's firing,

and the plaintiff has not shown that the true reason for the termination of his employment was discriminatory or otherwise shown intentional discrimination.

The defendant has presented evidence that the plaintiff was fired because he did not adequately prepare for his new role of Risk Manager and his performance in that role was deficient in a number of respects.  In terms of inadequate preparation, the defendant points out that the plaintiff was asked to attend a risk management training conference in March 2008 and a risk management seminar in September 2008 and he did not attend either.  Additionally, the plaintiff did not enroll in a risk management course given by GARP in preparation for the risk management certification exam.  Both Monteiro and Maria state that on several occasions after Lampros became Risk Manager, he was unable to answer their questions or gave evasive responses. The defendant also points to the plaintiff's suggestion of less conservative investment alternatives for the bank's end-of-day liquidity at the January ALCO meeting as an incident that raised concern about the plaintiff's ability to perform his job.  By offering a non-discriminatory reason for the termination of plaintiff's employment, the defendant has succeeded in shifting the burden back to the plaintiff to demonstrate that discrimination was the true reason for the plaintiff's firing.

17

The plaintiff has attempted to demonstrate that the defendant's decision was indeed discriminatory by arguing that the reasons given for firing him were pretextual.  The plaintiff contends that 1) the bank ignored its own termination policy; 2) the problems Maria identified with the plaintiff's performance in the January 2009 e-mail were specious; and 3) he did not give unsound advice about alternative investments at the January ALCO meeting.  These arguments do not address most of the reasons given by the defendant for its decision to terminate the plaintiff's employment, and in any event do not raise a question of fact that would allow a reasonable jury to find that the bank's stated reasons were pretextual or that it acted with discriminatory intent.

For example, while it is true that the bank's termination policy suggests that an employee ordinarily be given an opportunity to correct deficient performance, it also permits BdB "to terminate an employee whenever it deems appropriate." Thus, it cannot be said that the failure to give the plaintiff an opportunity to improve his performance was a violation of the bank's policy.  That the bank did not exercise its discretion to give its Risk Manager an opportunity to improve his performance in the midst of a national economic crisis is not surprising and carries little probative weight.

The plaintiff's effort to raise questions about the performance deficiencies listed in the January 2009 e-mail also misses the target.  First, the deficiencies noted in January have only a limited bearing on the reasons the bank has identified for terminating the plaintiff's employment in April. Moreover, although the plaintiff argues that neither Monteiro nor Maria could identify a single report of his that was incorrect, despite the emphasis in the January e-mail on the problems with his reports, he has offered no evidence that either man was in fact unable to identify deficient reports authored by the plaintiff.[5]

The plaintiff also argues that his advice at the January ACLO meeting -- that the bank consider alternatives to investing their end-of-day liquidity with the Federal Reserve Bank -- was simply a suggestion that the bank ought to remain "agile" in its investments.  However the plaintiff chooses to characterize the wisdom of that advice, it remains undisputed that his recommendation endorsed a less conservative investment strategy. An employer is entitled to use its own criteria in making an assessment of job performance, see Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997), and this difference of opinion about the soundness of Lampros's advice does not raise a

---

[5] The passages in the Monteiro and Maria depositions to which the plaintiff cites do not support this claim.

question of fact suggesting that the reasons given for firing
Lampros were pretextual.  It remains undisputed that Lampros
gave the advice and it would not have been unusual for
management to be concerned when its Risk Manager suggests a
riskier investment strategy at a time of great economic turmoil.
Thus, the plaintiff has not raised a question of fact that would
permit a reasonable juror to find that the bank's reasons for
terminating the plaintiff's employment were pretextual or that
it acted with discriminatory intent.

Finally, the plaintiff asserts that Gajano bore him animus
and influenced the decision to fire him and to replace him with
LoPiccolo.  Assuming for purposes of this discussion that the
plaintiff could show that Gajano was prejudiced against him
because he was American, or even because he was not Italian,
there is no evidence that Gajano played a "meaningful role" in
the decision to fire the plaintiff or to replace him with
LoPiccolo.  See Holocomb, 521 F.3d at 143 (citation omitted).
Indeed, there is no evidence that Gajano played any role in
either of these decisions.  Gajano was not Lampros' supervisor
and was not responsible for evaluating his performance.
Additionally, both Maria and Monteiro had the ability to
independently assess Lampros' performance; each of them belonged
to the Management Committee and Lampros reported directly to

20

Monteiro.  Thus, this is not a case in which the ultimate decision-maker had no ability independently to assess the plaintiff's performance or relied on the assessment of the plaintiff's direct supervisor who harbored discriminatory animus.

The plaintiff's argument also relies heavily on his contention that Gajano made his view of the plaintiff "known" by berating the plaintiff at the two ALCO meetings, by editing the ALCO minutes to include statements that the plaintiff considered to be inflammatory personal attacks, and by copying Monteiro on an email exchange between the plaintiff and Gajano in which they disagree on what kind of information the Risk Management department should be providing to the Treasury department. These exchanges, which are described in detail above, largely reflect disagreement about policy and practice.  Each of the witnesses was able to assess the merits of the positions taken by Gajano and Lampros, and make their own assessment of the soundness of Lampros' views and the unfairness of Gajano's critique.  These disagreements about the conduct of the bank's business, therefore, do not constitute evidence that those who decided to fire Lampros were improperly influenced by Gajano's discriminatory bias against the plaintiff.  As a result, the defendant's motion for summary judgment on the plaintiff's claim

21

for national origin discrimination under Title VII is granted.

2. Title VII Retaliation

The plaintiff's second Title VII claim asserts that he was fired in retaliation for his protests that the bank discriminated against Pais.  Title VII prohibits retaliation against an employee who engages in protected activity.  Section 2000e-3(a) of Title 42 of the United States Code provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . .

42 U.S.C. § 2000e-3(a).

There are four elements of a plaintiff's prima facie case of retaliation under Title VII.  The plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted).  If the plaintiff satisfies the "de minimis" burden of establishing a prima facie case, the burden of production shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  Id.  If a non-retaliatory reason is proffered, the burden returns to the plaintiff who

22

must show "that retaliation was a substantial reason for the adverse employment action."  Id.

A plaintiff participates in protected activity when he takes action to protest or oppose statutorily prohibited discrimination.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  Even if the employment practice opposed by the plaintiff is in fact lawful, the plaintiff may still have engaged in protected activity if he had a "good faith, reasonable belief" that the practice was unlawful.  Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996).  While Title VII's anti-retaliation provisions protect "the filing of formal charges of discrimination," they also protect "informal protests of discriminatory employment practices, including making complaints to management."  Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990); see also Cruz, 202 F.3d at 566.

The second element of a prima facie case of retaliation, the defendant's knowledge of plaintiff's engagement in protected activity, is satisfied if the plaintiff proves that the corporate entity -- the employer -- had knowledge that the plaintiff engaged in a protected activity.  This prong does not require the plaintiff to demonstrate that individuals who took the adverse employment action had knowledge of the plaintiff's

protected actions.  See Henry v. Wyeth Pharmaceuticals, Inc.,
616 F.3d 134, 147-48 (2d Cir. 2010); Gordon v. NYC Bd. of Educ.,
232 F.3d 111, 116 (2d Cir. 2000).

The required showing of an adverse employment action
differs in the context of a retaliation claim from the required
showing in a discrimination claim.  In the context of
retaliation claims, adverse employment actions are defined
broadly as employer actions that "could well dissuade a
reasonable worker from making or supporting a charge of
discrimination."  Burlington Northern & Santa Fe Railway Co. v.
White, 548 U.S. 53, 57 (2006).

Lastly, to complete his prima facie case of retaliation,
the plaintiff must establish a causal connection between the
plaintiff's protected activity and the employer's adverse
employment action.  A causal connection can be proven in two
ways:

> (1) indirectly, by showing that the protected activity
> was followed closely by discriminatory treatment, or
> through other circumstantial evidence such as
> disparate treatment of fellow employees who engaged in
> similar conduct; or (2) directly, through evidence of
> retaliatory animus directed against the plaintiff by
> the defendant.

Gordon, 232 F.3d at 117.  The fact that the individual who took
the adverse employment action lacked knowledge of the
plaintiff's protected activity "is admissible as some evidence

of a lack of a causal connection, countering plaintiff's

circumstantial evidence of proximity or disparate treatment."

Id.  The Second Circuit has made clear, however, that

> [a] jury . . . can find retaliation even if the agent
> denies direct knowledge of a plaintiff's protected
> activities, for example, so long as the jury finds
> that the circumstances evidence knowledge of the
> protected activities or the jury concludes that an
> agent is acting explicitly or implicit upon the orders
> of a superior who has the requisite knowledge.

Id.

The plaintiff has failed to make the requisite showing to

withstand summary judgment on his retaliation claim.  While the

plaintiff has offered sufficient evidence relating to the first

three elements of his prima facie case, he has failed to offer

evidence from which a reasonable jury could conclude that there

was a causal connection between the plaintiff's protected

activity and the adverse employment action he suffered.

Additionally, the defendant has proffered a non-retaliatory

reason for the plaintiff's discharge and the plaintiff has not

made an adequate showing that retaliation was a substantial

motivation in the bank's decision to fire him.

The defendant does not dispute that it would constitute

protected activity if a jury should find that the plaintiff took

Pais' complaint of discrimination to the bank's Human Resources

department in September of 2008 and to Monteiro in September of

25

2008, or if he complained to Soares in December of 2008 that
Gajano was firing people for discriminatory reasons.[6]  The
defendant does not agree, however, that the plaintiff's
discussions with Monteiro in February of 2009 may properly be
characterized as protected activity.  During this meeting, at
which the plaintiff complained about Gajano's treatment of him,
the plaintiff did not suggest that Gajano's behavior was
discriminatory or retaliatory.  Thus, it will be assumed for
purposes of the analysis that follows that Lampros only engaged
in protected activity in September and December of 2008.

The plaintiff has also shown that BdB had knowledge of the
protected activity and that he suffered an adverse employment
action when his employment was terminated in April of 2009.  The
plaintiff has not presented sufficient evidence, however, from
which a jury could find a causal connection between his firing
and his protected activity.

The plaintiff has no evidence of direct retaliatory animus
on the part of anyone at BdB.  Instead, the plaintiff has
attempted to indirectly establish a causal connection by showing
that the protected activity was closely followed in time by the
adverse employment action.  Measured either from September or
December of 2008, the time between the plaintiff's protected

---

[6] There is contrary evidence in the record with respect to
whether these conversations took place, but that is merely a
dispute of fact that may not be resolved on this motion.

activity and the termination of his employment was between four
and seven months.  The Second Circuit has "not drawn a bright
line to define the outer limits beyond which a temporal
relationship is too attenuated to establish causation."  Espinal
v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)(citation omitted).
The lack of a bright line means that a court must "exercise its
judgment about the permissible inferences that can be drawn from
temporal proximity in the context of particular cases."  Id.
While a time span of four months may be short enough to support
a finding of a causal connection in some circumstances, the
undisputed existence of a material intervening event severely
diminishes any inference that may be suggested by this temporal
proximity.  In January of 2009, the plaintiff began work as the
bank's Risk Manager in New York.  With this position came new
responsibilities; and the expectations of the plaintiff's
performance naturally changed.  The plaintiff frankly admits
that there were at least some aspects of this job for which he
lacked the desired experience.

The plaintiff makes essentially two arguments to suggest
that a causal connection has nonetheless been established.
First, the plaintiff speculates that Monteiro may have told
Gajano about the plaintiff's complaint about Gajano in September
2008 and that Gajano thereafter influenced Monteiro's decision

27

to fire the plaintiff.  To support this line of argument, the plaintiff points to Gajano's mistreatment of him.  Second, the plaintiff identifies two incidents that may have "reminded" Monteiro of the plaintiff's conversation with Monteiro in September 2008.

For several reasons, Gajano's treatment of the plaintiff does not provide evidence that links Lampros' complaint of discrimination and the decision to fire him.  First, as already discussed, neither Monteiro nor the others who decided to fire Lampros consulted Gajano about that decision and Monteiro had ample opportunity to observe Lampros as the BdB Risk Manager and assess his performance.  Second, Lampros has failed to provide any evidence that Gajano knew of the complaints of discrimination.[7]  Gajano's ignorance of Lampros' complaint, although not determinative, is at least some evidence against finding a causal connection.  Gordon, 232 F.3d at 117. Moreover, the plaintiff admits that Gajano was already acting abusively toward him before the plaintiff complained about Gajano's discrimination in September of 2008.

---

[7] The plaintiff admits that he has no direct knowledge that Gajano knew of his protected activity.  Gajano has attested that he had no such knowledge.  There is no evidence that BdB's Human Resources representatives raised the plaintiff's complaint with anyone and the plaintiff himself believes that they did not raise his complaints with senior management.  Soares and Monteiro denied having a conversation with the plaintiff about discrimination at all.

As significantly, the plaintiff has provided little if any evidence to show that Gajano's interactions with him during the interim period may reasonably be characterized as absuive. Although the plaintiff has described Gajano's behavior variously as aggressive, abusive and inhuman, the plaintiff is generally unable to offer any detail about Gajano's conduct.  For example, at one meeting of the Management Committee the plaintiff could recall only that Gajano mocked the plaintiff's use of the word "adamant."  With respect to the January 2009 ALCO meeting, the plaintiff recalls nothing specifically that Gajano said. Gajano's edits of the January ALCO meeting minutes and the alleged "email diatribe" are also weak evidence of abusive behavior.  This record is insufficient to suggest that the decision by Monteiro and others to fire Lampros in April 2009 was causally connected to Lampros' discussion of discrimination with Monteiro in September 2008.

The plaintiff has also pointed to two other incidents in an effort to shorten the time span between his protected activity and the termination of his employment.  The plaintiff contends that these two incidents may have reminded Monteiro in April 2009 of the plaintiff's September 2008 conversation with him. The first incident occurred sometime in either December 2008 or January 2009.  At this time, Monteiro was mailed a copy of a

court decision in Zakre v. Norddeutsche Landesbank Girontrale.
The Zakre decision involved a claim of sex discrimination
against Norddeutsche Landesbank Girontrale, which was Gajano's
former employer.  The second incident was the plaintiff's
February meeting with Monteiro at which the plaintiff complained
of Gajano's abusive behavior, but did not mention either
discrimination or retaliation.  The plaintiff has not shown that
any jury could reasonably infer that either incident would
remind Monteiro in April 2009, when he decided to fire Lampros,
of his conversation with Lampros in September 2008.

    But, even assuming the plaintiff had established a prima
facie case of retaliation, the defendant has proffered a non-
retaliatory reason for the plaintiff's firing and the plaintiff
has not shown that a reasonable jury could find that retaliation
was a substantial reason for his firing.  The bank relies on the
same neutral reason for the plaintiff's firing discussed in the
context of the plaintiff's discrimination claim.  The bank has
offered evidence that the plaintiff failed to prepare adequately
for his new role as Risk Manager and that his performance was
unsatisfactory.  The plaintiff relies as well on the same
arguments made with respect to his discrimination claim, to
demonstrate that the defendant's neutral reason is pretextual
and that retaliation was a substantial reason in the defendant's

decision to fire him.  The plaintiff's arguments about pretext
are no stronger in the retaliation context than they were in the
discrimination context.  In sum, the plaintiff has failed to
raise a question of fact suggesting that the reasons given for
firing him were pretextual.  As a result, the defendant's motion
for summary judgment with respect to the plaintiff's claim for
retaliation is granted.

3. Promissory Estoppel or Fraud

      The plaintiff's third cause of action pleads a state law
claim.  "A federal court . . . adjudicating state law claims
that are pendent to a federal claim must apply the choice of law
rules of the forum state."  Licci ex. Rel. Licci v. Lebanese
Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012).  The
parties do not dispute that the relevant law to be applied to
plaintiff's third cause of action is New York law.  "[W]here the
parties agree that New York law controls, this is sufficient to
establish choice of law."  Fed. Ins. Co. v. Am. Home Assurance
Co., 639 F.3d 557, 566 (2d Cir. 2011).  The parties do dispute,
however, whether New York's law of promissory estoppel or its
law of fraud should be applied to the plaintiff's third cause of
action.

      Under New York law, a claim for promissory estoppel has
three elements: "a clear and unambiguous promise; a reasonable

31

and foreseeable reliance by the party to whom the promise is
made; and an injury sustained by the party asserting the
estoppel by reason of his reliance." Esquire Radio & Elecs.,
Inc. v. Montgomery Ward & Co., Inc., 804 F.2d 787, 793 (2d Cir.
1986). In contrast, a claim of fraud under New York law
requires the plaintiff to establish "five elements by clear and
convincing evidence: 1) the defendant made a material
misrepresentation; 2) the defendant knew of its falsity; 3) the
defendant possessed an intent to defraud; 4) the plaintiff
reasonably relied on the misrepresentation; and 5) the plaintiff
suffered damage as a result of the misrepresentation." Kaye v.
Grossman, 202 F.3d 611, 614 (2d Cir. 2000). Ordinarily,
"promissory statements as to what will be done in the future"
are distinguished from misrepresentations of fact, and only the
latter can give rise to a claim for fraud or fraudulent
inducement. Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir.
1992)(citation omitted). "If a promise was actually made,
[however], with a preconceived and undisclosed intention of not
performing it, it constitutes a misrepresentation of material
existing fact." Id. (emphasis and citation omitted); see also
Wall v. CSX Transp., Inc., 471 F.3d 410, 415-16 (2d Cir. 2006).

The plaintiff's complaint framed his third cause of action
as a claim of promissory estoppel. The complaint alleged that

the defendant had made the plaintiff a clear and definitive promise to provide him with the necessary support and training for his new position as Risk Manager, that the plaintiff reasonably relied on this promise when he turned down an offer to become Chief Financial Officer of another bank, and that as a result of the defendant's failure to fulfill its promise the plaintiff was damaged.  The affidavits, exhibits and deposition excerpts submitted by the plaintiff in opposition to the defendant's motion to dismiss contain only remnants of this theory.  The plaintiff's memorandum of law in opposition to the defendant's motion for summary judgment redrafts the plaintiff's third cause of action as a claim for fraud, citing cases involving claims for fraud and attempting to fit the plaintiff's claim into the framework of those cases.  For the following reasons, the defendant's motion for summary judgment on the plaintiff's third cause of action is granted.

First, due principally to the fact that the plaintiff has abandoned his original theory of promissory estoppel, the plaintiff has failed to demonstrate that there are genuine issues of material fact preventing summary judgment on this claim.  The plaintiff avers that at the time he was offered the Risk Manager position, BdB promised him the training and support that he "might deem desirable" in order to perform the new

33

position.  This promise is not "clear and unambiguous."  As
formulated by the plaintiff, the promise is ambiguous; it does
not describe the kind of training or support he would be given.
Moreover, the promise, at least as phrased by the plaintiff, is
a promise to provide the plaintiff with the training and support
that he desired.  The plaintiff has offered no evidence that he
ever made a request for training and support that was rebuffed.
Thus, the defendant is entitled to judgment as a matter of law
with respect to the plaintiff's promissory estoppel claim.

The plaintiff requests that the Court construe the
plaintiff's third cause of action as an action for fraud.
Allowing a de facto amendment of the plaintiff's pleading at
this time would prejudice the defendant, which had no notice of
the plaintiff's fraud claim before the plaintiff submitted his
opposition to the motion for summary judgment.  Cf. MacDraw,
Inc. v. CIT Group Equip. Fin., Inc., 157 F.3d 956, 962 (2d Cir.
1998) (reasonable to deny leave to amend complaint where
proposed new claim would require additional discovery and cause
undue prejudice to defendants).  In any event, the plaintiff has
not submitted evidence to support his theory that he was
fraudulently induced to rescind his acceptance of the
alternative job offer.  In order for a promise of future action
to constitute a material misrepresentation of fact, the promisor

34

alternative job offer.  In order for a promise of future action to constitute a material misrepresentation of fact, the promisor must have had an undisclosed intention to not perform the promise.  The plaintiff has offered no evidence that Monteiro or Maria, or any other agent of Bdb, did not intend to provide the plaintiff with training and support as of January 2008 when the promise was made.  In consequence, the defendant's motion for summary judgment on the plaintiff's third cause of action is granted.

CONCLUSION

The defendant's July 13 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendant and close the case.

SO ORDERED:

Dated:    New York, New York
          December 4, 2012

_____
                DENISE COTE
        United States District Judge